Affirmed and Memorandum Opinion filed October 10, 2006








Affirmed and Memorandum Opinion filed October 10, 2006.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00578-CV

____________

 

IN THE INTEREST OF A.M.Q.

 

 



 

On Appeal from the 314th
District Court

Harris County, Texas

Trial Court Cause No. 03-08836J

 



 

M E M O R A N D U M   O P I N I O N

Maria Contreras[1]
appeals the termination of her parental rights with respect to her daughter,
A.M.Q., arguing that (1) the evidence is legally insufficient to support the
termination, (2) the evidence is factually insufficient to support the
termination, (3) the termination violates her federal due process rights, and
(4) the trial court erred in its appointment of joint managing conservators of
A.M.Q.  We affirm.








A.M.Q. was born on June 1, 2003.  On June 19th, Children=s Protective
Services (ACPS@) received a referral from hospital staff
alleging Contreras abandoned her child and was mentally unstable.  CPS already
had a history of neglectful supervision referrals against Contreras regarding
her other child, E.M.  Contreras= sister and her
husband, Josephine and Michael Zuniga, took A.M.Q. home from the hospital on
June 23, 2003, while CPS conducted its investigation into the June 19th
referral against Contreras.  The Zunigas were already caring for Contreras= son, E.M. 
Although CPS Caseworker Creisha Lewis-Cotton testified that A.M.Q. was two
weeks old when she came into care, CPS did not, at this time, seek temporary
conservatorship of A.M.Q.  

Contreras was involuntarily committed to the Harris County
Psychiatric Center (AHCPC@) on August 7th. 
On August 12, 2003, CPS visited Contreras at HCPC and obtained her signature on
a AChild Safety
Evaluation and Plan,@ wherein Contreras agreed to: (1)
participate in family-based safety services, (2) allow the Zunigas to care for
E.M. and A.M.Q. until CPS completed its investigation, and (3) schedule
visitation times with the Zunigas.  The bottom of this form contains the
following printed text:  AConclusionBIdentify plans for
further services.  When appropriate, describe the possible consequences if the
family does not carry out this plan successfully.@  The following
was written by hand:  AIf Maria Contraras [sic] does not comply
possible custody of [E.M.] and [A.M.Q.].@  Contreras was
released from HCPC on August 27th.  The Texas Department of Family Protective
Services (ATDFPS@) sought temporary managing conservatorship
of A.M.Q. on November 11, 2003, after Contreras was arrested for violating her
probation.[2]








On October 21, 2004, following a two-day trial, the
associate judge orally rendered judgment terminating the parent-child
relationship between Contreras and A.M.Q., pursuant to A.M.Q.=s best interests
and Texas Family Code section 161.001(E).[3] 
However, on November 4, 2004, the associate judge signed a judgment including
two additional grounds for terminating Contreras= parental rights. 
See Tex. Fam. Code Ann. ' 161.001(E), (N),
(O) (Vernon Supp. 2005) (establishing grounds for terminating the parent-child
relationship based on child endangerment, constructive abandonment, and failure
to comply with a court order).  Contrary to the recommendations of CPS, Child
Advocates, and A.M.Q.=s attorney ad litem, the trial court
awarded joint managing conservatorship of A.M.Q. to the Zunigas.[4]

We address Contreras= first and second
issues together, just as she has  presented them to this court.  In these two
issues, Contreras argues the evidence is legally and factually insufficient to
support the trial court=s finding she engaged in conduct or
knowingly placed A.M.Q. with persons who engaged in conduct that endangered
A.M.Q.=s physical or
emotional well-being, pursuant to section 161.001(E), or that termination serves
A.M.Q.=s best interests. 
Contreras does not challenge the trial court=s findings as to
subsections AN@ or AO.@  Therefore, even
if we found legally or factually insufficient evidence supports termination
based on subsection AE,@ Contreras could
not successfully challenge the court=s ultimate
judgment because two unchallenged grounds remain to support that judgment. 
Therefore, we do not address Contreras= evidentiary
challenges to subsection AE.@  We focus,
instead, on her argument that legally and factually insufficient evidence
supports the trial court=s finding that termination is in A.M.Q.=s best interests.








The natural right existing between a parent and child
involves fundamental federal Constitutional rights.  Holick v. Smith,
685 S.W.2d 18, 20 (Tex. 1985).  This natural right is Aessential,@ a Abasic civil right
of man,@ and is Afar more precious
than property rights.@  Id. (quoting Stanley v.
Illinois, 405 U.S. 645, 651 (1972)).  A termination decree is final and irrevocable. 
Id.  It divests the parent-child relationship for all time, as well as
all legal rights, privileges, duties, and powers between the parent and child,
except for the child=s right to inherit.  Id.  There
must, therefore, be clear and convincing evidence to support termination before
a court may involuntarily sever this relationship.  Santosky v. Kramer,
455 U.S. 745, 747 (1982);  Richardson v. Green, 677 S.W.2d 497, 500
(Tex. 1984).  AClear and convincing evidence@ means Athe measure or
degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.@  Tex. Fam.
Code Ann. ' 101.001 (Vernon 2002).  Consequently,
termination proceedings should be strictly scrutinized, and involuntary
termination statutes are strictly construed in favor of the parent.  Holick,
685 S.W.2d at 20B21.  

In a legal sufficiency review, we Alook at all
evidence in a light most favorable to the finding and determine whether a
reasonable trier of fact could have formed a firm belief or conviction that its
finding is true.@  In re J.F.C., 96 S.W.3d 256, 266
(Tex. 2002).  We assume disputed facts were resolved in favor of the movant if
it is reasonable to do so, and we disregard all evidence that could be
reasonably disbelieved.  Id.  This does not mean we disregard all
evidence that does not support the findingCdoing so could
skew our analysis.  Id.  If we find no fact finder could have formed a
firm belief or conviction that its finding is true, we must conclude the
evidence is legally insufficient.  Id. 








In a factual sufficiency review, we give due consideration
to evidence the jury could reasonably have found to be clear and convincing,
and we examine whether this evidence is such that a reasonable fact finder
could form a firm belief or conviction the allegations are true.  Id.  We
consider whether the disputed evidence is such that the jury could reasonably
resolve it in favor of its finding.  Id.  If, in light of the entire
record, the disputed evidence that cannot have reasonably been credited in
favor of the finding is so significant that the fact finder could not have
reasonably formed a firm belief or conviction in favor of termination, we must
find the evidence is factually insufficient.  Id.

There is a strong presumption that a child=s best interests
are served by staying with the natural parent, and the burden is on the State
to rebut that presumption.  In re U.P., 105 S.W.3d 222, 230 (Tex. App.CHouston [14th
Dist.] 2003, pet. denied).  For the trier of fact to determine whether this
presumption has been rebutted, it must consider many issues, including:  (1)
the child=s desires, (2) the present and future emotional and
physical needs and dangers to the child, (3) parenting abilities involved, (4)
programs available to help the parent, (5) the State=s plans for the
child and the stability of the proposed placement, (6) any of the parent=s acts or
omissions indicating the relationship is not a proper one, and (7) whether
there is any excuse for those acts or omissions.  Holley v. Adams, 544
S.W.2d 367, 371B72 (Tex. 1976).  This list is not
exhaustive, and evidence is not required on each listed factor.  U.P.,
105 S.W.3d at 230.  With these factors in mind, we look to whether clear and
convincing evidence supports the trial court=s finding that
termination is in A.M.Q.=s best interests.

A.M.Q. was seventeen months old at the time of judgment,
and was too young to express her wishes.  At trial, A.M.Q. was described as Aon target,@ happy and active,
with no special needs.[5] 
Therefore, A.M.Q. requires what any normal toddler requires from a caregiverCincluding a safe
and stable home environment.  See In re M.S., 115 S.W.3d 534, 548 (Tex.
2003) (stating a child is benefitted by preventing undue delay from adoption
into a stable home or return to the parents).








Despite being diagnosed as bipolar in March of 2000,
Contreras believes she is Anot mental@ and does not take
medication for her disorder.  Contreras was involuntarily committed to HCPC on
three occasions within the four years prior to trial, each commitment spanning
from between two and twenty days long.  HCPC records[6]
show Contreras was admitted involuntarily in late March of 2000, after her
family reported that she had been pacing the floor all night, talking to
herself, and saying that people were Aafter her.@[7]  She was held for
two days, and was observed to be well-groomed, cooperative, and as having Asome grandiose
beliefs@ and a Agenerally logical@ thought process. 
The physician determined she was not aggressive or combative, and did not meet
the criteria for involuntary commitment.  She was diagnosed with bipolar
disorder and was Astrongly advised@ to take her
medications and to follow up with state psychiatric services through the Harris
County Mental Health and Mental Retardation Authority (MHMRA). 

Contreras was
involuntarily committed a second time on Christmas day of 2001, after allegedly
threatening her brother with a knife, being hyperactive with Apressured@ speech, and
experiencing paranoid delusions.  She had recently delivered her first child
(A.M.Q.=s older brother,
E.M.).  Contreras was held for eight days, and her condition upon release was
described as follows:

She is still hypomanic, but less
intrusive and giggly.  Her social judgment is intact.  Her prognosis is guarded
due to less than perfect insight and past history of noncompliance with
medication.








Contreras= third involuntary commitment lasted for
twenty days, from August 7B27, 2003, just two months after A.M.Q.=s birth. 
Contreras= brother filed a mental health warrant alleging she
was verbally and physically aggressive, argumentative, that she punched holes
in the walls, broke windows, and was incapable of taking care of herself.[8] 
Contreras was placed on extended care at HCPC due to an unsatisfactory response
to initial treatment.  At discharge, she was compliant with her medications and
still exhibited Ahypomanic symptoms with mild flight of
ideas and poor insight into her illness.@  

At each discharge from HCPC, Contreras was advised to take
her prescribed medication.  At trial, when asked whether she was taking any
medications, Contreras replied, Aabsolutely not.@  When asked
whether she knew if she has been diagnosed with a psychological Adeficiency,@ she replied, ABy jail doctors,
Harris County jail doctors against my will.  They have to write diagnosis [sic]
that I don=t know about.  I don=t even recall
anything.@  She also testified she has never been prescribed
medication and is not currently under a psychiatrist=s care because she
is Anot mental.@  

During trial,
Contreras spoke out of turn at least twelve times.  She was escorted from the
courtroom twice, and was constantly reprimanded by the trial judge (including
threats of contempt of court, lockup and removal from the courtroom).  Her
testimony was disjointed and rambling, as exemplified by the following
excerpts.  After testifying that she lives at home with her mother and brother,
the following exchange occurred:

ATTORNEY: And how old is your
brother David?

CONTRERAS:        My brother is
probably B I don=t really know too much of him because
I=m very to myself and to my
children.

ATTORNEY: And B and B 

JUDGE:                 What did you
say?

CONTRERAS:        I=m to myself.  I don=t get into people=s business.

JUDGE:                 No.  The
question was how old is your brother.  Isn=t that what your question was?

ATTORNEY: Yes, your Honor.

CONTRERAS:        I don=t know much about my brother.

The following
exchange occurred when she was asked whether she received probation for
aggravated assault:

CONTRERAS:        Can I ask you a
question?  Was she white or Hispanic?  Is she a white female?








JUDGE:                 No.  You can=t ask a question.  How many times
have I told you that.  Answer the question.

CONTRERAS:        Can B she needs to answer me if she was a white
female that she=s being racist, biased.

At one
point, when an attorney stated he was not clear in phrasing a question to
Contreras, the trial judge stated:  AWell, none of us
are very clear on any of [Contreras=] answers.@  

When questioned about whether she signed the AChild Safety
Evaluation and Plan@ agreeing to allow the Zunigas to care for
her children until CPS completed its investigation, Contreras stated, AForced by CPS,
yes.  Forced by CPS.  Didn=t have a choice, yes.  Forced by CPS
behind my back.@  Contreras said she signed the agreement Abehind [her] will@ and was forced to
sign Aor my children
would be B my children were going to be placed in a foster home
and I didn=t want my children to be taken into a foster home when
I signed.@  CPS caseworker Creisha Lewis-CottonCone of three
different caseworkers on this case between June of 2003 and the October of 2004
trialCcorroborated
Contreras= statement to some extent when she testified that the
prior caseworker Aobviously@ must have visited
Contreras at HCPC in order to obtain her signature.  Cotton explained that CPS
procured this Plan in order to Amonitor@ the situation
while Contreras participated in services, and that the State only sought
custody of A.M.Q. after Contreras was arrested for violating her probation, her
noncompliance with the Plan by not taking parenting classes (Contreras had
completed these classes at the time of trial), and by her showing up uninvited
at the Zunigas= home several times.[9]








After reviewing the record, we find there is clear and
convincing evidence that termination is in A.M.Q.=s best interests. 
Contreras= mental instability, her refusal to accept her past
diagnosis or to consistently take her medication, and her history of violence,
threats and paranoia preceding her prior involuntary commitments reveal a high
risk of danger to A.M.Q. if returned to her mother.  See In re E.L.T.,
93 S.W.3d 372, 375B76 (Tex. App.CHouston [14th
Dist.] 2002, no pet.) (stating parent=s mental illness
may serve as basis for involuntary termination of parent-child relationship); C.G.V.
v. Tex. Dept. of Human Res., 663 S.W.2d 871, 874 (Tex. App.CBeaumont 1983, no
writ) (finding termination of parental rights was supported by evidence that
mother had frequently engaged in violent criminal conduct, had twice attempted
suicide, had been in and out of mental health institutions since age 15, and
was unable to care for children); see also Wetzel v. Wetzel, 715 S.W.2d
387, 390 (Tex. App.CDallas 1986, no writ) (reversing
termination when evidence showed mental illness was cured).  Even though
Contreras completed a parenting course, a CPR infant certification, called for
an appointment for a psychiatric evaluation required by CPS, lived in a Astable@ home with her
mother and brother, and participated in counseling with a priest, these facts
do not overcome the real threat of physical and emotional harm to A.M.Q. in
light of the well-known consequences of Contreras= refusal to accept
her diagnosis or to take her medications.  Furthermore, although there are
programs to help Contreras through MHMRA, such programs can be of no help when
Contreras does not admit she needs such assistance.  We overrule Contreras= first and second
issues.

In Contreras= third issue, she
contends the trial court violated her right to due process by ordering
termination of her parental rights.  Contreras argues that, because there was
insufficient evidence to terminate her parental rights, the trial court
violated her due process rights by ordering termination.  Because we have
already found that legally and factually sufficient evidence supports
termination (and because Contreras does not contest termination grounds AN@ or AO@), we overrule
Contreras= third issue.








In her fourth issue, Contreras argues the court erred by
appointing the Zunigas as joint managing conservators of A.M.Q. because the
Zunigas failed to provide legally and factually sufficient evidence that such
appointment was in A.M.Q.=s best interests.  Contreras= entire argument
rests on the contention that the Zunigas cannot be appointed joint managing
conservators because there was insufficient evidence with which to terminate
Contreras= parental rights.  As discussed above, we have already
found legally and factually sufficient evidence supports termination.  We
therefore overrule Contreras= fourth issue.

Having overruled each of Contreras= issues on appeal,
we affirm the trial court=s judgment.

 

 

 

 

/s/      J. Harvey Hudson

Justice

 

 

 

 

Judgment rendered
and Memorandum Opinion filed October 10, 2006.

Panel consists of
Justices Anderson, Hudson, and Guzman.









[1]  Contreras is also known as Mary Virginia Contreras.





[2]  Contreras pled guilty to aggravated assault on
January 28, 2000, and received a five-year probated sentence (she was accused
of pointing a handgun at a neighbor while stating that she knew how to use the
weapon).  Although Contreras contends on appeal that records of her guilty plea
were Aclearly hearsay,@
she admits they were entered into evidence without objection.  The CPS
caseworker, Creisha Lewis-Cotton, testified that, from her review of the case
file and from her discussions with a prior caseworker, she understood that
Contreras was arrested in November of 2003, for violating her probation. 
Contreras testified that she did not violate her probation, rather, she Ahalf completed it successfully.@  Contreras stated that, although ACPS Reyna is the one who violated me because she
called it in[,]@ Contreras Acompleted@ her five-year probation in Atwo years and a half.@





[3]  See Tex.
Fam. Code Ann. ' 161.001 (Vernon Supp. 2005) (allowing termination of
the parent-child relationship if the court finds clear and convincing evidence
that the parent has committed one of the statute=s enumerated acts and that termination is in the child=s best interests).





[4]  A.M.Q. was removed from the Zunigas= home in January of 2004, and placed in foster care
after Josephine Zuniga had to be removed from a court hearing involving
termination of parental rights to A.M.Q.=s
brother, E.M.  Following the outburst, that court ordered all children in State
custody who were housed with the Zunigas be removed into foster care.  After
this order (but possibly before Josephine Zuniga was made aware of the order),
Josephine Zuniga took A.M.Q. to Mexico for several days to attend a relative=s funeral without contacting TDFPS to obtain
permission.





[5]  Although witnesses testified that A.M.Q. had delays
(she was unable to sit on her own or crawl at seven months of age), everyone
agreed these delays were resolved at the time of trial.  There was conflicting
testimony as to whether or not A.M.Q. was born prematurely.





[6]  Although Contreras notes in her appellate brief that
these records were admitted over the objection of counsel, she does not
challenge their admission on appeal.





[7]  Contreras has always lived at home with her parents
and brother.  Her father passed away after her first involuntary commitment.





[8]  Although HCPC records note allegations that
Contreras was incapable of caring for herself or for her children, the record
indicates that both of Contreras= children
were in state custody at this time.





[9]  Although Cotton and the court-appointed child
advocate both claim Contreras only had one visit with A.M.Q., they also claim
she showed up unannounced at the Zunigas=
home repeatedly in order to visit with A.M.Q.  Contreras testified that she
visited with her children at the Zunigas=
home before her arrest in November, and that she was allowed thereafter to see
her children Awhenever Ms. Cotton said or I would go to jail . . . .@